The Richmond & Danville Railroad Co. *v.* Watts.

On the second trial of this case there was no evidence that by mutual consent, arising out of practice by watchmen and acquiescence therein, with knowledge, on the part of the superintending officers, the railway companies permitted the watchmen employed by them respectively to walk and stand upon the unoccupied tracks, including the main lines, for the purpose of examining the standing cars, with a view to take and report the initials and

numbering inscribed thereon. This being so, there was nothing to relieve the plaintiff below from the exercise of full diligence to protect himself; and had he exercised the ordinary diligence which is due from every intruder on a railway track to care for his own safety, he could have avoided the consequences to himself caused by the defendant's negligence. The court erred in not granting a new trial.

May 22, 1893.

Action for damages. Before Judge VAN EPPS. City court of Atlanta. September term, 1892.

JACKSON, LEFTWICH & BLACK, for plaintiff in error.

GLENN & SLATON, contra.

SIMMONS, Justice.

Watts, a night-watchman for the Western & Atlantic Railroad Company, while standing on the main track of the Georgia Pacific Railway Company, taking the numbers of certain cars which were upon the track of his own company near the track upon which he was standing, was run into by the train of the Georgia Pacific Railway Company. He brought his action for damages against the plaintiff in error, as lessee of the Georgia Pacific Railway Company, and on the last trial of the case recovered a verdict for $2,500. The railroad company made a motion for a new trial, which was refused, and it excepted.

Upon the evidence as it stood on the first trial, we held that the court below erred in granting a nonsuit. On that trial there was evidence that by mutual consent, arising out of practice by watchmen and acquiescence therein, with knowledge, on the part of the superintending officers, these railway companies permitted the watchmen employed by them respectively to walk and stand upon the unoccupied tracks, including the main lines, for the purpose of taking the numbers of cars standing upon the neighboring tracks, as the plaintiff was doing in this instance. And it was held that a watchman while so employed and deporting himself in the usual way

recognized as fit and proper by both companies, is not a trespasser upon the track of the company which did not employ him, any more than he is a trespasser upon the track of his own company,—indeed, is not a trespasser at all. From the report of the evidence on that trial (89 *Ga. Rep.* 282) it will be seen that the assistant superintendent of the Western & Atlantic railroad testified : " It was a common practice of the two roads to go on each other's tracks to hunt for cars or to get numbers, particularly the main line where they were generally open. The side-tracks at that time of the year were badly crowded with cars. It was the common practice to walk down the tracks to get the numbers of the cars, and almost absolutely necessary to walk on some other track besides those the cars were on. It was the practice all the time of both roads. As assistant superintendent witness knew that the practice existed, and did it time and again himself, and the Georgia Pacific people knew of it. The Georgia Pacific yardmaster, Turner, who managed the handling of cars, knew of it; witness had seen him down there very often; the local agent of the Georgia Pacific, who had charge of the tracks and their use in handling the train, . . saw us down there very often, and witness had met him there and talked about the condition of affairs there, and in regard to using each other's tracks." On the last trial there was no such evidence of consent on the part of the defendant. This witness, on the contrary, testified : " I do not know anything about the night-watchman at night. I never had any conversation with any official of the G. P. road with reference to the habits of the night-watchman. I do not know of my own knowledge whether they went on the main lines of each other's tracks at night to take the numbers of cars or not. I was down there at night, but I never paid any attention to the watchmen. I never noticed a G. P. watchman at night stand on the

main line of the Western & Atlantic, taking the numbers of the G. P. cars. As to a W. & A. on the G. P. main line taking the numbers, I never noticed anything of that sort." The witness testified that there was a custom on the part of the employees of each road to go upon the tracks of the other, but explained that this was for the purpose of transferring and delivering cars from one road to the other. Wylie, a yardmaster of the Western & Atlantic railroad, testified that it was the custom of employees of that company to take the numbers from the Georgia Pacific track, but that he had not seen and had never heard of an employee of the latter company taking numbers while standing on the Western & Atlantic track. "The custom I speak of was all on our side. So far as I know, the Georgia Pacific railroad never used the main line of the Western & Atlantic road for the purpose of taking the numbers of cars at night." He did not know that any officer or employee of the Georgia Pacific company had seen employees of the Western & Atlantic company at night on the main line of the Georgia Pacific, taking the numbers of cars. The only mutual use of each other's tracks known to the witness was in the transfer of cars from the one to the other. Mangum, another yardmaster of the Western & Atlantic railroad, who had supervision of its track at that point, testified to the same effect. The plaintiff himself testified: "I never saw a watchman of the Georgia Pacific road stand on the main line of my road at night, taking the numbers of cars. To the best of my recollection I am the only man on this earth that I ever saw stand on the main line of the track and take the numbers of cars." He had been employed on the road about seventeen nights. When he took the numbers, no one was with him but another watchman of his own road.

There being, therefore, so far as appears, no consent

on the part of the defendant to the plaintiff's presence on its track at the time and for the purpose stated, there was nothing to relieve him from the exercise of full diligence to protect himself; and had he exercised the ordinary diligence which is due from every intruder on a railway track, for his own safety, he could have avoided the consequences to himself caused by the defendant's negligence. The defendant was under no duty to anticipate the presence of the plaintiff upon its track at that time and place; but the plaintiff, when he went upon the track and so long as he remained upon it, was bound to look out for his own safety and to be on his guard against the approach of the defendant's train. He knew that he was in a place of danger, where trains were liable to pass at any moment. He testified: "Trains are going along there all times, night and day. There must have been as much as half a dozen trains went there between early night and midnight, freight and passenger-trains, going out and coming in. I knew that a good many trains went along there at night. . . I knew that two railroads (the Georgia Pacific and the East Tennessee) used that track; and these were passenger-trains and freight on both roads, both ways. I might expect them at any time." "I did not know the schedules of all the trains on the East Tennessee and Georgia Pacific railroads. I did not try to keep up with them. . . When I got hurt I did not know whether that was schedule time for some train to come along or not. I was standing there on the line of track where I might expect a train any minute, and I knew then that I was in a dangerous place." He heard an approaching train, which was making a great deal of noise, but he took it for granted that it was the same train he saw on another track, without looking to see whether one was coming on the track upon which he was standing. He stated that the train which ran into him could

have been seen fifty yards off, if he had looked in time. Under these circumstances it is clear that he was lacking in diligence for his own safety. There is nothing in the evidence to show recklessness or wantonness on the part of the defendant's employees in charge of the train, after the plaintiff was discovered on the track. It appears that they did all that could have been done to stop the train in time to avoid running into him. Before that time, as we have said, they were under no duty to look out for him. The verdict, therefore, was contrary to law and the evidence, and the court erred in not granting a new trial. See *Smith* v. *Central Railroad*, 78 *Ga*. 694; *Central Railroad* v. *Raiford*, 82 *Ga*. 400 ; *White* v. *Central Railroad*, 83 *Ga*. 595. *Judgment reversed.*